UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
LAMEL FABERS,

                     Petitioner,

           - against -

JAMIE LAMANNA,

                   Respondent.
----------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-2399 (PKC)

PAMELA K. CHEN, United States District Judge:

      Petitioner Lamel Fabers, appearing *pro se*,[1] petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his convictions for murder in the second degree and criminal possession of a weapon in the second degree.[2]  For the reasons set forth below, the petition is denied in its entirety.

## BACKGROUND

### I.    Facts

      On the evening of January 22, 2010, Petitioner attended a party at 287 Montauk Avenue in Brooklyn, New York.[3]  (Trial Transcript ("Tr."), Dkt. 9-3, at 458:7–9, 542:18–22, 550:21–551:1.)

---

[1] Because Petitioner is *pro se*, the Court liberally construes his petition and interprets it "to raise the strongest arguments that [it] suggest[s]."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks, italics, and citations omitted).  However, the Court notes that it "need not act as an advocate for" Petitioner.  *Curry v. Kerik*, 163 F. Supp. 2d 232, 235 (S.D.N.Y. 2001) (quoting *Davis v. Kelly*, 160 F.3d 917, 922 (2d Cir. 1998)).

[2] Petitioner does not challenge the sentences he received based on these convictions.

[3] Because Petitioner was convicted, the Court construes the facts in the light most favorable to Respondent.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."); *Cruz v. Colvin*, No. 17-CV-

Between 12 to 15 others were present at the party, including Shamil Paige, Monica Murray, who had been invited to the party to perform as a stripper, and Ayodele Philip, Murray's boyfriend. (*Id.*, Dkt. 9-2, at 176:15–177:24; 179:23–180:12, 186:12–17, 188:16–19, 188:22–24, 261:21–262:14, 266:1–11.)

At the party, in a back room of the house, Petitioner and another guest, Bobby Pressley, told Murray that if she wanted money she should "crawl to them." (*Id.* at 191:2.)  Petitioner then exposed his penis and told Murray "if you want this money come get it.  Come crawl to me." (*Id.* at 191:2–5.)  Murray began crawling to Petitioner when Philip walked in, became upset because none of the guests had money out, and walked out of the room. (*Id.* at 191:18–21, 191:24–192:1.) Murray followed Philip out of the back room into the living room and complained that she was not getting any money from the guests. (*Id.* at 192:15–19.)  Soon after Petitioner and Pressley also entered the living room and got into a heated argument with Philip. (*Id.* at 193:12–17.)  The fight escalated when Pressley started saying "shoot him, shoot him." (*Id.* at 194:18–24.)  Petitioner pulled a gun from his waistband and shot Philip several times. (*Id.* at 194:25–195:14, 197:4–21, 207:1, 269:16–22, 273:1–274:15, 277:4–12.)

Two New York City Police Department officers, Captain Scott Henderson and Lieutenant Mastronardi[4] happened to be in the area and responded quickly to the scene of the shooting. (*Id.* at 331:5–23.)  Henderson and Mastronardi became aware of the shooting after they saw a large group of people, including Petitioner and Pressley, running down Montauk Avenue saying that there had been a shooting. (*Id.* at 333:7–25, 340:21–341:21, 346:15–24, 350:13–17, 351:8–16.)

---

3757 (JFB), 2019 WL 3817136, at *12 (E.D.N.Y. Aug. 14, 2019) (citing, *inter alia*, *Jackson* and *Ponnapula*).

[4] Mastronardi's first name is not specified in the record provided to the Court.

Henderson tried to "stop the people that were running to find out what was going on[, but] because no one was saying that a particular individual was the perpetrator, they were just saying that someone had gotten shot," Henderson "chose not to stop [Petitioner] at that time." (*Id.* at 345:19–24.) Henderson "didn't see any weapon in [Petitioner's] hand, [and Petitioner] didn't appear to be injured," plus, Henderson's "focus at that time was to try to find the individual that [he] believed may have been shot." (*Id.* at 345:24–346:2.) Henderson then proceeded to 287 Montauk Avenue to investigate the report of the shooting, which is where he discovered Philip's body. (*Id.* at 334:2–23, 336:12–19.)

That same night, several individuals, including Petitioner and Pressley, were brought to the precinct, as potential witnesses, for interviewing by Detectives Kalisky and Bodnar.[5] (Tr., Dkt. 9-3, at 458:18–20, 461:17–19; *see also* Hearing Transcript ("Hr."), Dkt. 9-1, at ECF[6] 399:13–24, ECF 431:9–432:5.) As the detectives were interviewing the witnesses, they began to suspect that Petitioner and Pressley were actually involved in the shooting. (Hr., Dkt. 9-1, at ECF 431:9–12.) Kalisky then placed Petitioner in a photo array that he showed to Murray. (*Id.* at ECF 398:1–12.) Murray identified Petitioner from the photo array as the person who had shot Philip earlier that

---

[5] It is unclear how Petitioner was brought to the precinct, or whether he was brought as a witness or had already been arrested by this point. At a suppression hearing, Detective Kalisky testified that he was not aware of how Petitioner was brought to the precinct as it was Lieutenant Mastronardi who had brought in the group of people that included Murray, Paige, and Petitioner. (Hr., Dkt. 9-1, at ECF 432:3–433:14.) Kalisky also testified that he arrested Petitioner after Petitioner was positively identified as the shooter in the lineups. (*Id.* at ECF 420:25–421:2.) Though Captain Henderson testified that he did not stop Petitioner after seeing him on the street, there was no testimony from any witness as to what happened after that interaction or how Petitioner was in fact brought to the precinct. (*But see* Tr., Dkt. 9-2, at 355:10–19 (Petitioner's counsel stating that Petitioner would testify that "[h]e was grabbed off the street" by police officers, though he did not recall specifically who the police officers were.).)

[6] Citations to "ECF" refer to the "Page ID" number generated by the Court's CM/ECF docketing system and not the document's internal pagination.

night.  (*Id.* at ECF 398:13–20.)  Later that morning, Kalisky placed Petitioner in a lineup.  (Tr., Dkt. 9-3, at 474:10–12.)  Though Kalisky estimated Petitioner's weight at the time to be around 300 pounds, none of the other lineup participants, or "fillers," weighed more than 200 pounds.  (*Id.* at 484:22–24, 488:8–23.)  Petitioner was also the only lineup participant wearing all black clothing. (Hr., Dkt. 9-1, at ECF 426:18–20.)  Paige and Murray separately identified Petitioner from the lineup as the shooter.[7]  (*Id.* at ECF 413:17–414:22, ECF 417:8–418:12.)  Petitioner was then arrested.  (*Id.* at ECF 420:25–421:2.)  He was charged, under Kings County Indictment Number 799/2010, with Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree.  (R., Dkt. 9-4, at ECF 1234; *see also* Respondent's Affirmation in Opposition ("Resp.'s Aff."), Dkt. 9, at ¶ 5.)

## II.    Trial

Petitioner's jury trial was held from October 4, 2011 to October 14, 2011 before Justice Neil Jon Firetog, Supreme Court, Kings County.  (R., Dkt. 9-4, at ECF 1234, 1238 n.1.)  Prior to the trial, Justice Firetog held a *Wade* hearing[8] on October 3, 2011 and October 4, 2011, to determine whether the identifications by Paige and Murray should be suppressed because Petitioner's lineup was unduly suggestive.  (*See generally* Hr., Dkt. 9-1.)  At the hearing, Detective Kalisky, the prosecution's only witness, testified to the eyewitness identifications made by Murray, Paige, Guerrero, and Shields that led to Petitioner's arrest (*id.* at ECF 410:20–412:23 (Guerrero's identification), ECF 413:17–414:25 (Paige's identification), ECF 415:11–416:21 (Shields's

---

[7] Petitioner was also identified in lineups, as the shooter, by two other witnesses, Jorge Guerrero and Jasmine Shields.  (Hr., Dkt. 9-1, at ECF 410:20–413:7, ECF 415:11–416:21.) However, neither Guerrero nor Shields testified at trial and their identifications of Petitioner were not introduced as evidence against Petitioner.  (State Court Record ("R."), Dkt. 9-4, at ECF 1240 n.3.)

[8] A *Wade* hearing is a "motion to suppress identification[]."  *Raheem v. Kelly*, 257 F.3d 122, 125 (2d Cir. 2001).

4

identification), ECF 417:8–418:16 (Murray's identification)), as well as the efforts he made to find fillers for the lineup that matched Petitioner's appearance (*id.* at ECF 410:8–19, ECF 424:3–425:6, ECF 425:25–426:20, ECF 427:20–428:25).   The prosecution also introduced photo evidence of the lineups viewed by Murray, Paige, Guerrero, and Shields.   (*Id.* at ECF 413:11–414:3; ECF 415:5–22; ECF 417:1–17.)   Once the hearing concluded, Justice Firetog denied Petitioner's motion to suppress the lineup identification on the record, concluding that

> the lineup was not unduly suggestive and that there was no substantial likelihood of a misidentification based on either the conduct or the composition of the lineup. The fillers used were sufficiently similar in appearance to [Petitioner] and the lineup constituted a fairly representative panel upon which a witness could make a reliable identification.

(*Id.* at ECF 468:18–25.)   In making his decision, Justice Firetog specifically noted that he "examined the People's exhibits, the photographs of each of the lineups." (*Id.* at ECF 468:17–18.)

At trial, the prosecution presented 13 witnesses.   Murray and Paige testified to the events of the night of January 22, 2010.   (*See generally* Tr., Dkt. 9-2, at 175:6–237:12 (Murray testimony); *id.* at 260:17–322:13 (Paige testimony).)   Rachael Philip, Ayodele Philip's sister-in-law who also raised him, testified to identifying her brother's body after this death (*see generally id.* at 30:1–31:7), and Michael Philip, Ayodele Philip's brother, testified to finding the murder weapon, a gun, on the street outside of 287 Montauk Avenue (*see generally id.* at 238:16–242:22).   The prosecution also called several police officers, detectives, and technicians, who testified to the state of 287 Montauk Avenue after the shooting and the ensuing investigation.   These law enforcement witnesses included Detective Kalisky who testified, *inter alia*, to the eyewitness identifications of Petitioner by Murray and Paige, and Captain Henderson, who testified, *inter alia*, to encountering a large group of people, including Petitioner, running down Montauk Avenue saying that a shooting had just occurred.   (*See generally id.* at 328:1–351:20 (Henderson testimony); *id.*, Dkt.

9-3, at 454:24–500:2 (Kalisky testimony); *see also id.*, Dkt. 9-2, at 31:23–81:22 (Officer Tavolario testimony); *id.* at 82:15–122:18 (Detective Entemann testimony); *id.* at 124:7–171:25 (Detective Mauge testimony); *id.* at 243:17–257:23 (Detective Lotter testimony).)  Finally, the prosecution called several experts, including Dr. Frede Frederic, who performed the autopsy on Philip (*see generally id.*, Dkt. 9-3, at 367:9–389:21), James Valenti, who performed the firearm analysis on the murder weapon (*see generally id.* at 390:17–410:3), and Joanne Lee, who performed DNA analysis from samples gathered from the murder weapon (*see generally id.* at 414:11–445:8).

After Officer Henderson's testimony, Petitioner's counsel moved to reopen the suppression hearing because there is "suppression hearing testimony that said [Petitioner] was taken at the scene with a group of witnesses, which is in direct contradiction of what [Henderson testified to]." (*Id.*, Dkt. 9-2, at 353:17–20; *see also id.* at 352:13–21.)  The trial court denied the motion, stating that Petitioner's counsel had failed to state adequate grounds for a *Dunaway* hearing,[9] because there was no evidence that Petitioner was arrested prior to being brought to the precinct.  (*Id.* at 354:10–356:21.)  Once the prosecution rested, Petitioner's counsel moved to dismiss, which the trial court denied as well.  (*Id.*, Dkt. 9-3, at 500:13–501:15.)  Petitioner did not testify or present any evidence on his own behalf.  (*Id.* at 501:16–18.)

The jury deliberated for two days.  During their deliberations, the jury sent several notes to the trial court.  (*Id.* at 615:22–618:18, 618:23–636:13, 636:20–641:16.)  The trial court addressed the first of these notes outside the presence of counsel.  (*See id.* at 615:22–618:18.)  The trial court addressed the last two notes with counsel.  (*See id.* at 618:23–634:2, 636:3–13, 636:20–641:16.)

---

[9] "A *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial."  *Johnson v. Colvin*, No. 15-CV-5466 (PKC), 2018 WL 6250510, at *4 n.6 (E.D.N.Y. Nov. 29, 2018) (internal quotation marks and citation omitted).

The jury's first note asked for (1) the jury charge regarding acting in concert with respect to the weapon charge; (2) a readback of Lee's testimony, without her qualifications; and (3) Pressley's written statement.  (R., Dkt. 9-4, at ECF 1247–48.)  The second note requested readbacks of portions of the testimony of Paige, Murray, and Captain Henderson.  (*Id.* at ECF 1248.)  The third note asked to "[r]eview a diagram of Montauk St. [and] [r]eview the 'acting in concert' charge [with] respect to each count."  (*Id.*)  The fourth note asked for a "[r]eadback of jury charge regarding intent[,] any part of jury charge regarding acting in concert.  Other than the general section which was just read back to us.  Elements of Bobby Pressley's counts." (*Id.* at ECF 1249.)  The fifth, and final, note asked for (1) a review of the definition of acting in concert; (2) a "[r]eview [of the] count in regards to possession"; and (3) a question whether "acting in concert [can] occur after the elements of a crime have previously been met."  (*Id.* at ECF 1250.)

On October 14, 2011, the jury found Petitioner guilty of murder in the second degree and one count of criminal possession of a weapon in the second degree.  (Tr., Dkt. 9-3, at 642:10–643:10.)  Petitioner was sentenced to consecutive prison terms of 22 years to life for the murder conviction and 13 years, plus five years of post-release supervision, for the weapons possession conviction.[10]  (Resp.'s Aff., Dkt. 9, ¶ 7.)

### III.    Procedural History

Petitioner appealed his conviction to the New York Appellate Division, Second Department ("Second Department").  (*See generally* R., Dkt. 9-4, at ECF 1231–70, ECF 1329–65.)  In his counseled brief, he argued that (1) the identification lineup was unduly suggestive because Petitioner was the only extremely heavy man and the only person wearing all black

---

[10] The Court notes that Petitioner's sentencing is not included in the trial transcript.  Only the sentencing of his co-defendant Pressley is included.  (*See* Tr., Dkt. 9-3, at ECF 1224–29.)

clothing in the lineup, (2) the trial court's imposition of consecutive prison terms for murder and weapons possession was illegal and excessive, and (3) the trial court's failure to follow the proper procedure for responding to jury notes violated his due process right to a fair trial. (*Id.* at ECF 1253–69.)  Petitioner also submitted a *pro se* supplemental brief in which he argued that (1) the trial court erred by failing to reopen the suppression hearing after Captain Henderson's testimony contradicted that of Detective Kalisky, (2) the verdict was against the weight of the evidence, and (3) his trial counsel was constitutionally ineffective for failing to request a jury instruction on circumstantial evidence. (*Id.* at ECF 1343–65.)  On November 4, 2015, the Second Department affirmed Petitioner's judgment of conviction and denied all of Petitioner's claims on the merits.[11] *People v. Fabers*, 20 N.Y.S.3d 89 (N.Y. App. Div. 2015).  Petitioner sought leave to appeal to the New York Court of Appeals (R., Dkt. 9-5, ECF 1397–1404), which denied his request. *People v. Fabers*, 62 N.E.3d 125 (N.Y. 2016).

On October 17, 2016, Petitioner filed a *pro se* N.Y. C.P.L. § 440.10 Motion to Vacate Judgment ("Section 440 Motion") in which he argued that (1) evidence was introduced at trial in violation of Petitioner's Confrontation Clause right, (2) evidence was introduced at trial that the prosecutor knew, or should have known, was false in violation of Petitioner's due process rights, and (3) new evidence had been discovered, *i.e.*, new eyewitness testimony. (Petition Exhibit 1 ("Pet. Ex. 1"), Dkt. 1-1, at ECF 187–227.)  Petitioner also argued that his trial counsel was constitutionally ineffective for (1) failing to object to the testimony of DNA expert Dr. Lee, (2) failing to request independent DNA testing and/or calling a DNA expert, (3) failing to object to empaneling certain prospective jurors, (4) failing to object to improper statements made by the

---

[11] However, the Second Department did reduce Petitioner's sentence for the weapons possession charge from thirteen years to five years, still to run consecutively to his second-degree-murder sentence. *Fabers*, 20 N.Y.S.3d at 90.

prosecution during summation, (5) failing to object to the trial court's response to the jury notes, (6) agreeing to a stipulation regarding the source of DNA samples from Petitioner, and (7) failing to request a missing witness jury instruction for eyewitnesses Shields and Guerrero.  (*Id.*; *see also* R., Dkt. 9-5, at ECF 1436–37.)  In response, the trial court ordered a hearing on the issue of newly-discovered evidence and assigned counsel for Petitioner.  (Resp.'s Aff., Dkt. 9, ¶ 14.)  However, after Damali Joseph, Petitioner's newly-identified eyewitness, failed to appear at several scheduled hearings, the trial court dismissed Petitioner's Section 440 Motion on the record on August 10, 2017, stating that the court is "going to deny the 440 motion at this time but without prejudice.  If it comes to fruition at some point in the future that this woman [Damali Joseph] decides to cooperate [Petitioner] can renew [his] motion."  (R., Dkt. 9-5, at ECF 1478.)  Though it does not appear that the trial court reduced its determination to writing, Petitioner attempted to appeal that decision to the Second Department.[12]  (*See id.* at ECF 1417 (Petitioner's Sept. 7, 2017 Affidavit in Support of Motion for Permission to Appeal).)  However, Petitioner received a letter, dated September 21, 2017, from the Second Department noting that "[t]he annexed papers have been rejected for filing" because "on a motion for leave to appeal, you have failed to annex a copy of the order, judgment or determination sought to be reviewed and the decision, if any, as required by § 670.5(d)(1)."  (Pet. Ex. 1, Dkt. 1-1, at ECF 26.)  Petitioner does not provide any further information regarding his Section 440 Motion.[13]

---

[12] It is also unclear whether the trial court's dismissal without prejudice applied to Petitioner's entire Section 440 Motion or only his newly-discovered evidence claim.  (*See* R., Dkt. 9-5, at ECF 1477 (noting that the trial court "granted a hearing on the *sole* issue of newly discovered evidence") (emphasis added).)

[13] On October 11, 2017, Petitioner also filed a *pro se coram nobis* motion in the Second Department alleging ineffective assistance of appellate counsel.  (R., Dkt. 9-5, at ECF 1480–97.) This motion was denied.  *People v. Fabers*, 69 N.Y.S.3d 511 (N.Y. App. Div. 2018).  Petitioner

Petitioner filed the instant *habeas* petition on April 18, 2018.  (Dkt. 1.)  On September 13, 2018, the Court noted that Petitioner had not properly exhausted his newly-discovered evidence claim and directed Petitioner to indicate whether he intended to exhaust this remedy and whether Joseph intended to cooperate by appearing at a Section 440 Motion hearing.  (Sept. 13, 2018 Order; *see also* Oct. 16, 2018 Order.)  On November 9, 2018, Petitioner submitted a sworn affidavit from Damali Joseph, indicating, in sum and substance, that Joseph witnessed the shooting and that Petitioner was not the shooter.  (Joseph Affidavit ("Joseph Aff."), Dkt. 12-1, at 1–3.)  Petitioner asked "the Court to equitably proceed with the actual innocence claim, because the witness is reluctant to appear due to mental, emotional[,] and employment issues."  (Petitioner's Letter, Dkt. 12, at ECF 1540.)

## LEGAL STANDARD

### I.    Federal Habeas Relief

Under 28 U.S.C. § 2254 ("Section 2254"), a *habeas corpus* application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks and citation omitted).  "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that

---

did not seek leave to appeal.  (Resp.'s Aff., Dkt. 9, ¶ 17.)  However, Petitioner does not bring this specific ineffective assistance of appellate counsel claim in the instant action.

presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013); *see id.* at 301–02 (explaining that "the presumption that the federal claim was adjudicated on the merits may be rebutted" by either (1) "the habeas petitioner (for the purpose of showing that the claim should be considered by the federal court *de novo*)"; or (2) "the State (for the purpose of showing that the federal claim should be regarded as procedurally defaulted)").

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal quotations and citation omitted).  A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" Supreme Court cases, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (internal quotation marks and citation omitted).

A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Id.* (internal quotations and citation omitted).  The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)); *see also Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (observing that where a state court adjudicates a federal constitutional claim on the merits, "we must apply AEDPA deference").  "An unreasonable

application occurs when 'the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) (alteration in original).

Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## II.    Exhaustion of State Remedies

Generally, "before a federal court can consider a habeas application brought by a state prisoner, the habeas applicant must exhaust all of his state remedies." *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) (citing 28 U.S.C. § 2254(b)(1)(A)). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Id.* (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)) (internal brackets omitted).  While exhausted claims for *habeas* relief should be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d), unexhausted claims can be denied on the merits only if they are "unquestionably meritless." *Ricks v. Superintendent of Marcy Corr. Facility*, No. 10-CV-0785 (MAT), 2012 WL 162608, at *2 (W.D.N.Y. Jan. 19, 2012) (quoting *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010)); *see also Warren v. Goord*, No. 06-CV-1423 (RRM), 2013 WL 1310465, at *11 (E.D.N.Y. Mar. 28, 2013) ("Though neither the Supreme Court nor the Second Circuit has

established a standard to guide the exercise of this discretion, many courts in this Circuit have denied unexhausted claims upon a determination that they are patently frivolous."); *Naranjo v. Filion*, No. 02-CV-5549 (WHP) (AJP), 2003 WL 1900867, at \*8 (S.D.N.Y. Apr. 16, 2003) (collecting cases).

## DISCUSSION

Petitioner advances several claims in support of his request for federal *habeas* relief.  Only some of these claims are exhausted.  The Court separately considers Petitioner's exhausted and unexhausted claims, according to the applicable standard.

## I.    Exhausted Claims

Petitioner has sufficiently exhausted five of his claims: (1) the lineup was unduly suggestive; (2) the trial court failed to follow the proper procedure for responding to jury notes; (3) the trial court erred by failing to reopen the suppression hearing; (4) Petitioner's verdict was against the weight of the evidence; and (5) Petitioner's trial counsel was constitutionally ineffective for failing to request a circumstantial evidence jury charge.  *See Fabers*, 20 N.Y.S.3d at 90–91 (denying, on the merits, these five claims); *see also Fabers*, 62 N.E.3d at 125 (denying Petitioner leave to appeal these five claims).  Because the Second Department rejected these claims on the merits, *Fabers*, 20 N.Y.S.3d at 90–91, that court's decision is entitled to AEDPA deference. *See* § 2254(d); *Eze*, 321 F.3d at 121.  The Court addresses each claim in turn.

### A.    Petitioner's Claim That His Lineup Was Unduly Suggestive

Petitioner first argues that the January 23, 2010 lineup, where he was identified as the shooter by four eyewitnesses, violated his due process rights under the Fourteenth Amendment because it was "unduly suggestive."  (Petition, Dkt. 1, at ECF 6.)  He contends that, given Murray and Paige's description of the shooter as a heavy black man who was wearing all black clothing, the lineup was unduly suggestive, because Petitioner was "the only extremely heavy person—

13

everyone else weighed 200 pounds or less—and . . . he was the only individual who was wearing all black clothing" in the lineup.  (Reply, Dkt. 11, at 2.)  The Second Department rejected Petitioner's argument on direct appeal, holding that "[a]lthough lineup participants should share the same general physical characteristics, there is no requirement that a defendant in a lineup be surrounded by persons who are nearly identical in appearance." *Fabers*, 20 N.Y.S.3d at 90.

To determine whether a lineup was unconstitutional, "[t]he court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) (quoting *Raheem*, 257 F.3d at 133).  "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem*, 257 F.3d at 134.  "If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; no further inquiry by the court is required, and the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." *Brisco*, 565 F.3d at 88 (quoting *Raheem*, 257 F.3d at 133).

Here, the hearing record demonstrates that the lineup procedure was not unduly suggestive. First, the trial court's factual determination that Petitioner was sufficiently similar in appearance to the fillers in the lineup is entitled to AEDPA deference.  (Hr., Dkt. 9-1, at ECF 468:22–25 ("The fillers used were sufficiently similar in appearance to [Petitioner] and the lineup constituted a fairly representative panel upon which a witness could make a reliable identification.").) *Eze*, 323 F.3d at 121.  "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  In this case, despite the size

14

difference between Petitioner and the other individuals in the lineup, the record does not establish

that the state court's determination with respect to the lineup amounted to constitutional error.  *See*

*Jones v. Fischer*, No. 05-CV-7774 (WHP), 2009 WL 884814, at *5 (S.D.N.Y. Mar. 30, 2009)

(finding that "[a]lthough [petitioner] is larger than the other men in the lineup, there is no evidence

strong enough to disturb the trial court's finding that the members of the lineup were sufficiently

similar in appearance").

Rather, the record supports the reasonableness of the state court's conclusion that the lineup

was not unduly suggestive.  Before the lineup, Paige described the shooter as "a male black,

approximately, six one to six three, about 280 to 300 pounds wearing all black.  [He was wearing]

[a] black leather jacket, black shirt, black pants and read [sic] and black sneakers."  (Hr., Dkt. 9-

1, at ECF 390:25–400:3.)  Murray provided a similar description: "It was a large dark skinned

male black. . . .  He had on a black jacket, black jeans and a black hat."  (*Id.* at ECF 393:24–394:4.)

Though Petitioner was the largest person in the lineup (*id.* at ECF 425:3–6), and the only person

wearing all black (*id.* at ECF 426:18–20), these aspects of Murray and Paige's descriptions are not

so unique as to make the lineup unduly suggestive.[14]  *See McBride v. Larkin*, No. 12-CV-4703

---

[14] The Court notes that in *Raheem*, which involved similar facts, the Second Circuit found
that a lineup in which the petitioner was the only person in the lineup wearing a black leather coat
was unduly suggestive when the "two witnesses had given the police descriptions that emphasized
the shooter's black leather coat" and both eyewitnesses repeatedly stated that they had identified
the shooter based on the leather coat that the shooter was wearing in the lineup.  257 F.3d at 136–
37; *see also id.* at 137 ("Plainly, the black leather coat worn by the shooter at the Moulin Rouge
was the outstanding feature of the assailant's appearance in the minds of [the eyewitnesses], was
an integral part of the description that each provided to the police, and was a critical factor in those
witnesses' selection of [the shooter] from the lineup.").  The same is not true here.  Though Murray
and Paige mentioned Petitioner's black clothing, this aspect of their statements was not an
"outstanding feature" of their overall descriptions which also mentioned Petitioner's height,
weight, and other clothing items.  Moreover, Petitioner provides no evidence that Petitioner's
clothes, or his weight, were a critical factor in how Murray or Paige identified Petitioner in the
lineup.  *See Jackson v. Brandt*, No. 10-CV-5858 (PAC) (KNF), 2012 WL 591386, at *6 (S.D.N.Y.
Feb. 23, 2012) (holding that a lineup was not unduly suggestive when the eyewitness "gave a

(KBF), 2013 WL 1736586, at *5 (S.D.N.Y. Apr. 19, 2013) ("[Petitioner's] complaint that he was dressed in one specific article of clothing—a gray sweatshirt-during the lineup is undercut by the fact that the description provided by the crime scene witness [] described in detail [Petitioner's]— and the other individuals in the lineup's-physical characteristics and other clothing."); *Carroll v. Greene*, No. 04-CV-4342 (RWS), 2006 WL 2338119, at *11 (S.D.N.Y. Aug. 11, 2006) (noting that a "lineup was not unduly suggestive even though petitioner was the only individual wearing a brown leather jacket because [the] witness had not focused on that aspect of his assailant's appearance") (citing *Gilbert v. Superintendent of the Collins Corr. Facility*, No. 03-CV-3866 (LBS), 2004 WL 287683, at *12 (S.D.N.Y. Feb. 11, 2004)).  Furthermore, Petitioner was seated during his lineups, which diminished the size difference between him and the other lineup subjects. (*Cf.* Hr., Dkt. 9-1, at ECF 411:7–24.)  *See Stallings v. Heath*, No. 11-CV-4894 (DLC) (AJP), 2012 WL 735399, at *11 (S.D.N.Y. Mar. 7, 2012) (finding that "while the fillers were between 20 to 123 pounds heavier than [the petitioner], the lineup was not unduly suggestive based on disparate weights since the lineup participants were seated, with their lower bodies covered and their torso largely covered by their number cards"), *report and recommendation adopted*, 2012 WL 1538513 (S.D.N.Y. May 2, 2012).  "It is well-settled that there is no requirement that all line-up participants be identical in appearance." *Corchado v. Rabideau*, 576 F. Supp. 2d 433, 447 (W.D.N.Y. 2008); *see also Roldan v. Artuz*, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000) ("Police stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required.  There is no requirement that a suspect in a lineup be surrounded by people identical in

---

comprehensive description of the robber," "the record is devoid of evidence establishing that the robber's brown jacket or sweater stood out to [the eyewitness] in any way or was the outstanding feature of the robber's appearance in her mind," and the brown jacket was not "a critical factor in [the eyewitness's] determination to select [petitioner] from the lineup"), *report and recommendation adopted*, 2012 WL 2512015 (S.D.N.Y. June 29, 2012).

16

appearance.") (internal quotation marks and citations omitted).  In sum, the record provides ample support for the Second Department's determination that Petitioner's lineup was not unduly suggestive, and that ruling, therefore, is not contrary to, or an unreasonable application of, clearly established federal law.

Moreover, "[e]ven if an identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable." *Brisco*, 565 F.3d at 89.  As explained in *Brisco v. Ercole*:

> [C]ourts generally look to five established factors, first set forth in *Neil v. Biggers* [409 U.S. 188, 199–200 (1972)]: [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Id.*  "None of these factors standing alone is dispositive of the existence of independent reliability; instead, reliability is assessed 'in light of the totality of the circumstances.'"  *Id.* (quoting *Raheem*, 257 F.3d at 135).

Therefore, even assuming *arguendo*, that the lineup in this case was unduly suggestive, Plaintiff's claim is still foreclosed because the eyewitness identifications of Plaintiff were independently reliable.  First, both Murray and Paige had a significant opportunity "to view the criminal at the time of crime." *Raheem*, 257 F.3d at 135.  Murray, for example, testified to having an extended interaction with Petitioner shortly before the shooting during which Petitioner was "rude." (Tr., Dkt. 9-2, at 190:7–191:25.)  Likewise, Paige testified that she observed Petitioner arguing with Philip and that it was only "after a while that they were talking, [that Philip] got shot." (*Id.* at 269:20–21; *see also id.* at 274:4–6 (noting that Paige didn't run into the other room until after Petitioner fired the first shot).)  These opportunities to observe Petitioner close in time to the shooting are sufficient to support a finding of independent reliability.  *See Charlemagne v. Goord*,

No. 05-CV-9890 (DAB) (HBP), 2008 WL 2971768, at *15 (S.D.N.Y. June 30, 2008) (finding that first *Biggers* factor was satisfied when the witness observed the petitioner for "two to three minutes" immediately after the incident in question), *report and recommendation adopted sub nom.*, 2011 WL 2150646 (S.D.N.Y. May 31, 2011); *Bratcher v. McCray*, 419 F. Supp. 2d 352, 360–61 (W.D.N.Y. 2006) (noting that an identification's reliability was supported by the fact that a witness "testified in detail as to the perpetrator's actions during the robbery and how the robbery occurred"); *Roberson v. McGinnis*, No. 99-CV-9751 (DAB) (AJP), 2000 WL 378029, at *9 (S.D.N.Y. Apr. 11, 2000) (noting that a witness had a "good opportunity" to view the petitioner when the witness "had seen [the petitioner] earlier in the day of the shooting [and] observed [the petitioner] in the few minutes before the shooting").

That Murray and Paige's descriptions of Petitioner before the lineup were consistent with each other and accurately described Petitioner further support a finding that their identifications of Petitioner are independently reliable, *see, e.g.*, *Stewart v. Lee*, No. 09-CV-4374 (ENV), 2014 WL 3014608, at *10 (E.D.N.Y. July 3, 2014) (finding an identification independently reliable because, *inter alia*, the witness's "description of the suspect accurately captured [the petitioner's] characteristics"), as does the fact that both Murray and Paige identified Petitioner the same night as the shooting, *see Vasquez v. Poole*, 331 F. Supp. 2d 145, 160 (E.D.N.Y. 2004) (noting that the fact that the identification took place only one-and-a-half hours after the incident was "extremely significant"). Finally, Petitioner also provides no evidence to suggest that either Murray or Paige were unsure about their identifications. (*Cf.* Hr., Dkt. 9-1, at ECF 414:19 ("[Paige] stated [Petitioner] was the shooter."); *id.* at ECF 418:14 (Murray stated that Petitioner "was the shooter at the party.").) Accordingly, the *Biggers* factors, when considered with the totality of the circumstances, support a finding that Murray and Paige's identifications of Petitioner were

independently reliable.  Finally, this finding is bolstered by the fact that, before identifying Petitioner in a lineup, Murray also identified Petitioner in a photo array.  (*Id.* at ECF 398:15–20.) Petitioner has not made any arguments in the instant petition that the photo array was unduly suggestive.  Notably, in the photo array, Petitioner was wearing a white shirt.  (*Id.* at ECF 455:1–2.)  *See Hylton v. Ercole*, No. 05-CV-4077 (NGG), 2010 WL 2594744, at *13 (E.D.N.Y. June 23, 2010) (finding identification was independently reliable because, *inter alia*, the eyewitness had previously identified the petitioner in a non-suggestive photo array, that was "independent of the lineup's suggestive elements," prior to the lineup identification).  Therefore, even assuming that the identification procedure was unduly suggestive, a consideration of the *Biggers* factors strongly supports the conclusion that the lineup identifications were independently reliable.

Accordingly, Petitioner's due process rights were not violated by the use of the lineup identifications at trial and his claim for *habeas* relief on this ground is denied.

### B.   Petitioner's Claim That the Trial Court Failed to Follow the Proper Procedures for Responding to Jury Notes

Petitioner next argues that his due process right to a fair trial was violated when the trial court failed "to follow the proper procedure for responding to the first five jury notes or discuss the first three jury notes with the attorneys[,] and did not read verbatim or summarize the two notes that followed."  (Petition, Dkt. 1, at ECF 8.)  Petitioner bases his claim on New York Criminal Procedure Law § 310.30[15] and *People v. O'Rama*, 579 N.E.2d 189 (N.Y. 1991).  (Reply, Dkt. 11, at 3.)

---

[15] New York Criminal Procedure Law § 310.30 provides that

At any time during its deliberation, the jury may request the court for further instruction or information with respect to the law, respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case.  Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel

Petitioner's claim fails for two reasons.  First, "[a] federal habeas court will not review a claim rejected by the state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (internal quotation marks, brackets, and citation omitted).  On direct appeal, the Second Department rejected Petitioner's "contention that the Supreme Court failed to comply with the procedure for handling jury notes" because it was "unpreserved for appellate review." *Fabers*, 20 N.Y.S.3d at 90.  The Second Department's determination that Plaintiff's claim was unpreserved for review is based on New York's "contemporaneous objection rule," which provides that an objection is preserved if the objecting party "(1) made his or her position regarding the ruling known to the trial court; (2) made a protest, and the trial court 'expressly decided the question raised on appeal'; or (3) 'without success . . . either expressly or impliedly sought or requested a particular ruling.'" *Downs v. Lape*, 657 F.3d 97, 102–03 (2d Cir. 2011) (quoting N.Y. Crim. Proc. L. § 470.05(2)).

The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule" and has observed "that the rule constitute[s] an independent ground for disposing of" a petitioner's claim on federal *habeas* review. *Downs*, 657 F.3d at 104; *see also Garcia v. Lewis*, 188 F.3d 71, 78–79 (2d Cir. 1999) ("[I]f a state appellate court refuses to review the merits of a criminal defendant's claim of

for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper.  With the consent of the parties and upon the request of the jury for further instruction with respect to a statute, the court may also give to the jury copies of the text of any statute which, in its discretion, the court deems proper.

*Id.*; *see also O'Rama*, 579 N.E.2d at 191 ("CPL 310.30 thus imposes two separate duties on the court following a substantive juror inquiry: the duty to notify counsel and the duty to respond.").

constitutional error because of his failure to comply with a contemporaneous objection rule, a federal court generally may not consider the merits of the constitutional claim on habeas corpus review.") (internal quotations, brackets, and citation omitted).  The Court therefore declines to consider Plaintiff's claim regarding the trial court's handling of the jury notes, given the Second Department's finding that this claim was not preserved for appellate review.  *See Serrano v. Kirkpatrick*, No. 11-CV-2825 (ER) (PED), 2013 WL 3226849, at *10 (S.D.N.Y. June 25, 2013) (holding that petitioner's jury note claim did not provide a basis for *habeas* review when the Second Department had found that petitioner failed to preserve the claim for appeal); *see also Cromwell v. Smith*, No. 13-CV-29 (KBF), 2014 WL 1280287, at *9 (S.D.N.Y. Mar. 25, 2014) ("[B]ecause there is no dispute that petitioner failed to object to the evidence [at trial] . . . the contemporaneous objection rule provides an adequate and independent ground to support the Appellate Division's rejection of the petitioner's claims.").

Second, even assuming, *arguendo*, that Petitioner's claim was preserved, his claim would nonetheless fail because this claim is rooted in state law and is therefore not cognizable on federal *habeas* review.  *See Encarnacion-Cross v. McAuliffe*, No. 17-CV-3603 (PAE) (GWG), 2018 WL 1913835, at *7 (S.D.N.Y. Apr. 23, 2018) ("Case law has recognized that a claim premised on a violation of New York Criminal Procedure Law Section 310.30 does not allege a violation of a federally protected right.") (internal quotations, brackets, and citation omitted), *report and recommendation adopted*,  2018 WL 3384438 (S.D.N.Y. July 11, 2018); *Cornado v. Bellnier*, No. 10-CV-5265 (RA) (HBP), 2012 WL 6644637, at *5 (S.D.N.Y. Sept. 20, 2012) (collecting cases); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

The Court recognizes that "a criminal defendant has a Sixth Amendment right to ensure that jury notes are answered in open court and that counsel is given the opportunity to be heard before the judge responds to the note." *Serrano*, 2013 WL 3226849, at *10 (citing *United States v. Robinson*, 560 F.2d 507, 516 (2d Cir. 1977) (*en banc*)). However, in addition to showing that the trial court failed to follow the proper procedures when responding to jury notes, a petitioner is only entitled to relief if he can also show "sufficient prejudice." *Id.* Here, Petitioner has not alleged that he suffered any prejudice as a result of the trial court's alleged mishandling of some of the jury notes. (*See* Reply, Dkt. 11, at 2–3). *See Williams v. Artus*, 691 F. Supp. 2d 515, 525 (S.D.N.Y. 2010) (finding that petitioner did not establish prejudice when he "made no suggestion of what impact, if any, his counsel's input would have had on the court's responses to the jury's notes").

Moreover, the Court does not find that Petitioner was prejudiced by the trial court's actions. The jury notes that the trial court responded to, without giving Petitioner a chance to be heard, only required the trial court to read certain parts of the record or the jury instructions to the jury. (*See* Tr., Dkt. 9-3, at 615:24–616:16 (noting that jury was provided with the diagram of Montauk Avenue and Pressley's written statement and portions of Henderson's testimony); *see also* R., Dkt. 9-4, at ECF 1247–48 (describing the content of the first three jury notes that were discussed outside the presence of counsel).) All of the jury notes that involved decisions as to how to address them were discussed with Petitioner's counsel before the trial court responded to the note in front of the jury. (*See* Tr., Dkt. 9-3, at 618:23–619:7 (deciding, with counsel, what part of the intent jury charge to read, given the jury's fourth note); *id.* at 620:11–625:14 (deciding, with counsel, whether the trial court's *sua sponte* objections made during trial meant that portions of Paige's testimony should not be read back).) Accordingly, given that Petitioner had the opportunity to respond to

the jury notes, even if the trial court did not follow the proper procedures, he is unable to establish prejudice. *See Serrano*, 2013 WL 3226849, at *10 (finding no prejudice because, *inter alia*, "although the trial court did not confer with counsel prior to responding to the jury note, it did read the note into the record in the presence of both counsel and the jury. This gave Petitioner's trial counsel an opportunity to suggest a further response, which he did."); *cf. Jones v. Smith*, No. 09-CV-6497 (PAE) (GAY), 2012 WL 1592190, at *7 (S.D.N.Y. May 7, 2012) (noting that under state law, the failure to provide counsel with meaningful notice of jury notes when the "required responses [] were overwhelmingly mechanical or ministerial" was "not nearly as problematic, or potentially prejudicial, as in *O'Rama*"). Therefore, even if Petitioner had brought a claim based on the Sixth Amendment, rather than state law, he would still not be entitled to *habeas* relief.

Accordingly, *habeas* relief is denied on Petitioner's claim relating to the trial court's handling of the jury notes.

### C.   Petitioner's Claim That the Trial Court Erred by Failing to Reopen the Suppression Hearing

Petitioner next argues that the trial court abused its discretion by failing to reopen the suppression hearing, after Petitioner's trial counsel made the request based on an alleged factual discrepancy between the hearing testimony of Detective Kalisky and Captain Henderson. (Reply, Dkt 11, at 3.) Specifically, Petitioner points to three discrepancies: (1) Detective Kalisky testified that he heard shots being fired before responding to the scene on the night of the shooting, whereas Captain Henderson only testified that he observed a dispute (and not that he heard shots being fired); (2) Detective Kalisky testified that Petitioner was brought to the precinct between 1:15 and 1:30 a.m. on the night of the shooting, whereas other records indicated that Petitioner was arrested approximately four hours later, and (3) Detective Kalisky testified that Detective Mastronardi stopped everyone who was running on Montauk Avenue the night of the shooting, whereas Captain

Henderson testified that, having no probable cause to stop anyone and wanting to investigate the report of the shooting, he did not stop the group of people that included Petitioner, from fleeing the scene.  (*Id.* at 5.)

Arguments that the trial court misapplied state law are not cognizable on federal *habeas* review.  *See DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004) ("State courts are the ultimate expositors of state law; it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions.") (internal quotations and citations omitted); *Ponnapula*, 297 F.3d at 182 ("[N]ot every error of state law can be transmogrified by artful argumentation into a constitutional violation.") (internal quotations and citation omitted); *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001) ("The state court ruling . . . is an interpretation of state law that we will not review.").  However, "[a] federal habeas court may . . . review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a fundamentally fair trial."  *Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012) (internal quotation marks and citation omitted).  "Therefore, for Petitioner to sustain his cause of action, he must show that any error of state law—such as the denial of a *Wade* hearing—'render[ed] petitioner's state trial fundamentally unfair' and thus violated his constitutional due process rights."  *Andrews v. LeClaire*, 709 F. Supp. 2d 269, 278–79 (S.D.N.Y. 2010) (quoting *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993)); *see also Greaves v. Brown*, No. 06-CV-3524 (ARR), 2007 WL 1232077, at *4 (E.D.N.Y. Apr. 26, 2007) (finding that petitioner's claim that a suppression hearing should have been reopened was an issue of state law not cognizable on *habeas* review); *Tirado v. Walsh*, 168 F. Supp. 2d 162, 170–71 (S.D.N.Y. 2001) (finding that petitioner's claim that the state court improperly reopened a suppression hearing was an issue of state law).

Here, the Second Department found that the trial court "did not err in denying [Petitioner's] trial motion to reopen the suppression hearing [because] [Petitioner] failed to show that the new facts he proffered in support of the motion were likely to affect the original determination." *Fabers*, 20 N.Y.S.3d at 90 (internal citations omitted).  The Court agrees.

Petitioner's argument focuses on inconsistencies between Detective Kalisky's hearing testimony and other testimony and evidence presented at trial.  However, because none of these inconsistencies related directly to the ultimate determination to be made at Petitioner's *Wade* hearing, *i.e.*, whether his lineup was unduly suggestive, they do not constitute newly discovered "additional pertinent facts," N.Y. Crim. Proc. Law § 710.40(4), that necessitated a reopening of the suppression hearing.  *See Farrell v. Ercole*, No. 07-CV-8073 (LAP) (HBP), 2011 WL 8198114, at *26 (S.D.N.Y. Dec. 8, 2011) ("These [newly-discovered] facts must go 'to the issue of the official suggestiveness such that they would materially affect or have affected the earlier *Wade* determination.'") (quoting *Lynn v. Bliden*, 443 F.3d 238, 249 (2d Cir. 2006)) *as amended* (May 19, 2006)), *report and recommendation adopted*, 2012 WL 2832511 (S.D.N.Y. July 10, 2012). Rather, these inconsistencies, at most, called into question Kalisky's overall credibility.  However, while Kalisky was the only witness at the suppression hearing, the trial court also relied independently on photographs of the lineups as they were presented to Murray and Paige to determine whether the lineup was unduly suggestive.  (*See* Hr., Dkt. 9-1, at ECF 468:22–25; *see also id.* at ECF 413:11–414:3; ECF 415:5–22; ECF 417:1–17.)  This assessment did not depend in any way on Detective Kalisky's testimony and thus could not have been affected by that testimony.[16]   Additionally, both Captain Henderson and Detective Kalisky testified at trial

---

[16] Unlike the situation presented in *People v. Pollard*, 986 N.Y.S.2d 867 (N.Y. Sup. Ct. 2014) (reported in table), on which Petitioner relies, where the trial court could only have relied on the testimony of a witness whose credibility was then called into question because the

regarding the events leading to Petitioner's identification, and "[f]ederal constitutional law does not warrant granting a habeas petition on the basis of denial of a pre-trial hearing where Petitioner had the opportunity to cross-examine the witness on the identification issue and to argue in summation that there might have been a problem with the identification procedure." *Andrews*, 709 F. Supp. 2d at 279 (quoting *Garcia v. Kuhlmann*, 897 F. Supp. 728, 730–31 (S.D.N.Y. 1995)); *cf. Lynn*, 443 F.3d at 250 ("An inquiry into inconsistent statements regarding identifications is a task for trial counsel on cross-examination of the identifying witnesses.").  Therefore, doubts as to Detective Kalisky's overall truthfulness, without more, are insufficient to render Petitioner's state trial fundamentally unfair, when there was other evidence at Petitioner's *Wade* hearing to support the trial court's finding and Petitioner had the opportunity to cross-examine Kalisky at trial after these inconsistencies came to light.[17]

Accordingly, the trial court's decision not to reopen the suppression hearing did not render Petitioner's trial fundamentally unfair, and the Second Department's affirmance of that decision was not contrary to, or an unreasonable application of, clearly established federal law.  Petitioner's claim for *habeas* relief on this ground is denied.

### D.  Petitioner's Claim That the Trial Court Erred by Failing to Grant a *Dunaway* Hearing

The *pro se* petition in this matter also suggests, albeit unclearly, a claim that the trial court erred by failing to grant Petitioner a *Dunaway* hearing, to determine whether there was probable

---

prosecutor had failed to preserve an adequate picture of the lineup itself, *id.* at *8, here, the trial court's determination rested on its own evaluation of the photographic evidence and was not reliant on finding Kalisky credible.

[17] The Court also notes that "[e]ven if the testimony indicated sufficient reason to reopen the *Wade* hearing, there is nonetheless a reasonable probability that evidence of the lineups would not have been suppressed on the basis of independent reliability," *Schouenborg v. Superintendent Auburn Corr. Facility*, 707 F. App'x 20, 23 (2d Cir. 2017) (summary order), as discussed in more detail *supra*.

26

cause to arrest Petitioner, after Petitioner's trial counsel argued, mid-trial, that such a hearing was warranted based on Detective Kalisky's purportedly inconsistent testimony about when and how Petitioner was brought to the precinct.  (*Cf.* Reply, Dkt. 11, at 5.)  During the trial, after Captain Henderson's testimony, Petitioner's counsel argued that "as it becomes evidently clear from Captain Henderson's testimony, my client was not seen or stopped at the scene.  Apparently, he left the scene.  Somewhere else later on, he was grabbed and taken to the precinct which requires us to open up that suppression hearing because he was taken to the precinct."  (Tr., Dkt. 9-2, at 352:13–20; *see also id.* at 353:16–20 ("But, the bottom line, we have suppression hearing testimony that said he was taken at the scene with a group of witnesses, which is in direct contradiction of what this witness said.").)  The trial court denied the request for a *Dunaway* hearing.  (*Id.* at 354:11–13 ("You [Petitioner] have the burden in laying out on a Dunaway the grounds of the Dunaway.  You never did it and you still haven't.").)

A claim that Petitioner was arrested without probable cause is based on the Fourth Amendment.  *See Encarnacion -Cross*, 2018 WL 1913835, at *5–6.  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 482 (1976); *accord Graham v. Costello*, 299 F.3d 129, 133–34 (2d Cir. 2002) ("As a general rule, Fourth Amendment claims are not reviewable by the federal courts when raised in a petition brought under § 2254 unless the state prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in the state court.") (citations omitted).

> A federal court will therefore review a Fourth Amendment claim in a habeas petition only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective

mechanism, but the defendant was precluded from using that mechanism because
of an unconscionable breakdown in the underlying process."

*Encarnacion -Cross*, 2018 WL 1913835, at *5 (quoting *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir.

1992)).  The Second Circuit has held that "federal courts have approved New York's procedure

for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* [] as

being facially adequate."  *Capellan*, 975 F.2d at 70 n.1 (internal quotation marks and citation

omitted).  Therefore, Petitioner must show that there was an "unconscionable breakdown" in the

process.  *Encarnacion -Cross*, 2018 WL 1913835, at *5 (internal quotation marks and citation

omitted).  Petitioner is unable to do so here.  "An unconscionable breakdown occurs when the state

court fails to conduct a reasoned inquiry into the petitioner's claim."  *Valtin v. Hollins*, 248 F.

Supp. 2d 311, 317 (S.D.N.Y. 2003).  Nothing in the record suggests that Petitioner was not able to

raise this argument at trial, or in his various appeals afterwards.  Rather, Petitioner's trial counsel

raised this issue twice, first during the *Wade* hearing and again at trial.  (*See* Hr., Dkt. 9-1, ECF

444:13–448:21 (noting that Petitioner's counsel requested a *Dunaway* hearing during Petitioner's

*Wade* hearing but was denied); *see* Tr., Dkt. 9-2, at 352:13–356:21 (noting that Petitioner's counsel

renewed the request for a *Dunaway* hearing at trial but was again denied).)  Although Petitioner's

request for a *Dunaway* hearing was denied each time, "mere disagreement with the outcome of a

state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective

process."  *Encarnacion -Cross*, 2018 WL 1913835, at *6 (quoting *Capellan*, 975 F.2d at 72); *see*

*also Lopez v. Lee*, No. 11-CV-2706 (JG), 2011 WL 6068119, at *9 (E.D.N.Y. Dec. 7, 2011) ("The

trial court's decision that [petitioner's] conclusory allegations were insufficient to warrant an

evidentiary hearing was not an unconscionable breakdown in the procedures for resolving his

Fourth Amendment claim.").

Accordingly, Petitioner's claim for habeas relief based on the trial court's failure to conduct a *Dunaway* hearing is denied.

### E.   Petitioner's Claim That the Verdict was Against the Weight of the Evidence

Petitioner argues that his conviction was against the weight of the evidence.  (Petition, Dkt. 1, at ECF 11 (arguing that "the trier of fact failed to accord the proper weight on unreliable witness identification and vacatur of the verdict would not be unreasonable under the proper weight of the evidence analysis").)  Such a claim is not cognizable on federal *habeas* review.  *See McKinnon v. Superintendent, Great Meadow Corr. Facility,* 422 F. App'x 69, 75 (2d Cir. 2011) (summary order); *see also Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles.")).  "It is well-established that a weight of the evidence claim is exclusively a matter of state law and therefore presents no federal question reviewable by a federal habeas court."  *Lopez v. Superintendent of Five Points Corr. Facility*, No. 14-CV-4615 (RJS) (JLC), 2015 WL 1300030, at *12 (S.D.N.Y. Mar. 23, 2015), *report and recommendation adopted*, 2015 WL 2408605 (S.D.N.Y. May 20, 2015).  Petitioner is therefore not entitled to federal relief on this ground. However, given Petitioner's *pro se* status, the Court construes his claim as asserting a sufficiency of the evidence claim under the Fourteenth Amendment's Due Process Clause.

"[E]vidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Coleman v. Johnson*, 566 U.S. 650, 654 (2012) (quoting *Jackson*, 443 U.S. at 319).  "Moreover, in considering such a sufficiency claim, a habeas court must weigh the evidence in the light most favorable to the prosecution and draw all permissible inferences in its favor."  *Flowers v. Ercole*, No. 06-CV-6118 (LTS) (FM), 2009 WL 2986738, at

*20 (S.D.N.Y. Sept. 18, 2009) (citing *Jackson*, 443 U.S. at 326).  As a result, "[a] habeas petitioner challenging his conviction on the ground that it was not supported by sufficient evidence 'bears a very heavy burden.'"  *Taylor v. Connelly*, 18 F. Supp. 3d 242, 266 (E.D.N.Y. 2014) (quoting *Einaugler v. Sup. Ct. of State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997)).

"When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'"  *Id.* (quoting *Ponnapula*, 297 F.3d at 179).  Petitioner was convicted of murder in the second degree and criminal possession of a weapon in the second degree.  (Tr., Dkt. 9-3, at 642:14–643:23.)  "New York law provides that a person is guilty of intentional murder in the Second Degree when, '[w]ith the intent to cause the death of another person, he causes the death of such person.'"  *Copeland v. Walker*, 258 F. Supp. 2d 105, 118 (E.D.N.Y. 2003) (quoting N.Y. Penal Law § 125.25(1)).  "Under NY Penal Law 265.03(1)(b), the elements of criminal possession of a weapon in the second degree are possession of a loaded firearm and intent to use it unlawfully against another."  *Griffin v. City of New York*, No. 16-CV-5790 (ER), 2019 WL 280366, at *4 (S.D.N.Y. Jan. 18, 2019).  However, a person can also be found guilty of criminal possession of a weapon in the second degree by just possessing a loaded firearm.  *See id.* (citing N.Y. Penal Law § 265.03(3)).  Here, the trial evidence was sufficient to establish Petitioner's guilt as to both crimes.

As an initial matter, given that the Second Department decided that the verdict was not against the weight of the evidence, *Fabers*, 20 N.Y.S.3d at 90–91, it necessarily also found that the verdict was supported by sufficient evidence.  *See, e.g.*, *Parker v. Ercole*, 666 F.3d 830, 835 (2d Cir. 2012) (finding that a state court's review of weight claim "necessarily subsumed review of [petitioner's] sufficiency claim").  Furthermore, given that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction," *Flowers*, 2009 WL

2986738, at *20 (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)), it is clear that there was more than sufficient evidence supporting Petitioner's convictions as to both offenses.  Specifically, at trial, two eyewitnesses testified that they saw Petitioner get into an argument with Philip, and that in the course of the argument, Petitioner pulled out a gun, and shot Philip multiple times.  (Tr., Dkt 9-2, at 193:12–197:9 (Murray testimony); *id.* at 269:16–277:15 (Paige testimony).)  The testimony of these two witnesses was corroborated by the testimony of the DNA analysis expert, Criminalist Joanne Lee, who testified that Petitioner's DNA was found on the murder weapon.  (*See, e.g.*, Tr., Dkt. 9-3, at 429:18–430:20.)  This evidence is sufficient to support the jury's verdict against Petitioner.

Petitioner's arguments that Murray and Paige's accounts of the shooting were inconsistent (Reply, Dkt. 11, at 7) or that eyewitness testimony is inherently unreliable (*id.* at 8) are unavailing. "The weight to which the eyewitness testimony was entitled at trial was, of course, a question of fact for the jury." *Huber v. Schriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001); *see also Flowers*, 2009 WL 2986738, at *20 ("A sufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact.") (citing, *inter alia*, *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).  "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 326); *see also United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[I]t is well-settled that when reviewing the sufficiency of the evidence we defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony.") (internal quotations and citation omitted); *Crawford v. New York*, No. 07-CV-4760

(SLT), 2010 WL 2651654, at *7 (E.D.N.Y. June 28, 2010) ("When reviewing a case for legal sufficiency, a court may not 'disturb the jury's findings with respect to [a witness's] credibility' about testimony presented at Petitioner's trial.") (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989)).

Though not raised by Petitioner, the Court also finds that the evidence was sufficient for the jury to find that Petitioner acted with the requisite *mens rea* for his second-degree murder conviction, namely, "intent to cause the death of another person." N.Y. Penal Law § 125.25(1); *see also Carmichael v. Racette*, No. 11-CV-6294 (MAT), 2012 WL 1854702, at *7 (W.D.N.Y. May 21, 2012) ("A person cannot be punished for the crime of second degree murder under Penal Law § 125.25(1) unless the result[—]death[—]was intended.") (quoting *People v. Fernandez*, 673 N.E.2d 910, 913 (N.Y. 1996)). "Under New York law, a person acts intentionally when his conscious objective is to cause a particular result." *Williams v. Chappius*, No. 16-CV-8329 (PAE) (SN), 2018 WL 7133267, at *5 (S.D.N.Y. Nov. 16, 2018) (citing N.Y. Penal Law § 15.05(1)), *report and recommendation adopted*, 2019 WL 330630 (S.D.N.Y. Jan. 25, 2019). "A defendant's intent may be inferred from the natural and probable consequences of his actions." *Id.* at *5 (citing *People v. Getch*, 407 N.E.2d 425, 465 (N.Y. 1980)). The evidence at trial established that Petitioner shot Philip multiple times at close range, after engaging in a heated argument with Philip, and after being urged by Pressley, to shoot the victim. These circumstances, especially the fact that the shooting was at close range and involved multiple shots, provided a sufficient basis for the jury to find that Petitioner intended to cause Philip's death. *See Velazquez v. Artus*, No. 14-CV-6265 (MAT), 2015 WL 1097409, at *7 (W.D.N.Y. Mar. 11, 2015) (finding that evidence supported finding petitioner intentionally caused the victim's death "by shooting him multiple times at close range").

Accordingly, Petitioner's claim for *habeas* relief based on the sufficiency of the evidence is denied.

### F.   Petitioner's Claim That Petitioner's Trial Counsel Provided Ineffective Assistance for Failing to Request a Circumstantial Evidence Jury Charge

Petitioner argues that his trial counsel was ineffective because he failed to request a circumstantial evidence jury charge.[18]   (*See* Pet. Ex. 1, Dkt. 1-1, at ECF 99–104.)  A circumstantial evidence charge generally instructs the jury that "when there are two viable interpretations of the evidence, but one is consistent with innocence, then the jury should give the defendant the benefit of the doubt."  *Dillon v. Smith*, No. 07-CV-10728 (ALC) (RLE), 2015 WL 13745783, at *17 (S.D.N.Y. Dec. 22, 2015) (citing *People v. Sanchez*, 463 N.E.2d 1228, 1229 (N.Y. 1984)), *report and recommendation adopted sub nom. Dillon v. Conway*, 2016 WL 6634917 (S.D.N.Y. Nov. 9, 2016), *appeal dismissed Dillon v. Smith*, 2017 WL 6397760 (2d Cir. 2017).

"The Supreme Court in *Strickland* set forth a two-part test for evaluating claims of ineffective assistance of counsel.  To warrant relief, a defendant must demonstrate both 'that counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'"  *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Under *Strickland*'s first prong, counsel's conduct falls to the level of being deficient if 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  *Eze*, 321 F.3d at 125 (quoting *Strickland*, 466 U.S. at 687).  Under the second prong, a counsel's conduct prejudiced the defense if "there is a reasonable

---

[18] Petitioner raised ineffective assistance of trial counsel claims in both his direct appeal and Section 440 Motion.  As discussed *supra*, only the claims that Petitioner raised in his direct appeal are exhausted.  Accordingly, the Court will consider the ineffective assistance of counsel claim Petitioner raised in his direct appeal here, and will consider the remainder of Petitioner's ineffective assistance claims *infra* when it addresses Petitioner's unexhausted claims.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 123 (quoting *Strickland*, 466 U.S. at 688, 694).

"To prevail [on an ineffective assistance claim], a defendant must establish both of *Strickland*'s prongs because, otherwise, 'it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the process unreliable, and the sentence or conviction should stand.'" *Id.* (quoting *Bell v. Cone*, 535 U.S. 685, 695 (2002)).  Furthermore, "[o]ur scrutiny of counsel's performance must be 'highly deferential' because we must apply 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015) (quoting *Strickland*, 466 U.S. at 689).

Here, Petitioner's argument that his trial counsel was constitutionally ineffective fails on both grounds.  The Second Department rejected Petitioner's argument stating that "[a circumstantial evidence] charge would not have been warranted here." *Fabers*, 20 N.Y.S.3d at 91 (citing, *inter alia*, *People v. Rodriguez*, 688 N.Y.S.2d 713, 714 (N.Y. App. Div. 1999) (holding that a circumstantial evidence jury instruction was not required when there was direct evidence of the defendant's guilt)).  "[U]nder New York law, a circumstantial evidence jury charge is only required, at the defendant's request, when the evidence against a defendant is comprised *solely of* circumstantial evidence." *Norwood v. Artis*, 487 F. Supp. 2d 321, 333 (W.D.N.Y. 2007) (citing *People v. Daddona*, 615 N.E.2d 1014, 1015 (N.Y. 1993); *People v. Barnes*, 406 N.E.2d 1071, 1073–74 (N.Y. 1980)).  Eyewitness testimony is direct evidence. *See Pilgrim v. Keane*, No. 97-CV-1517 (SJ), 2004 WL 1810344, at *3 (E.D.N.Y. Aug. 9, 2004) (noting that the case against the petitioner included direct evidence in the form of eyewitness testimony).  Accordingly, given that the evidence against Petitioner included direct evidence, a circumstantial evidence charge was not

warranted, *see, e.g.*, *Floyd v. Miller*, No. 01-CV-2097, 03-MC-66 (JBW), 2003 WL 21845995, at *7–8 (E.D.N.Y. Aug. 6, 2003), and Petitioner's counsel was not ineffective for failing to request one.  *See Flowers*, 2009 WL 2986738, at *20 ("Failure to make a meritless argument does not amount to ineffective assistance.") (quoting *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)).

Furthermore, even if Petitioner was able to satisfy *Strickland*'s first prong, his claim would nonetheless fail because he is unable to show that his counsel's failure to request a circumstantial evidence instruction was prejudicial.  As discussed, "[a] circumstantial evidence charge would [have] instruct[ed] the jury that when there are two viable interpretations of the evidence, but one is consistent with innocence, then the jury should give the defendant the benefit of the doubt." *Dillon*, 2015 WL 13745783, at *17.  However, "[w]hen a circumstantial evidence charge would not have changed the jury's guilty verdict, no prejudice exists."  *Parisi v. Artus*, No. 08-CV-1785 (ENV), 2010 WL 4961746, at *5 (E.D.N.Y. Dec. 1, 2010).  Here, given that Petitioner's guilty verdict was supported by the testimony of two eyewitnesses that was not subject to different interpretations, Petitioner has failed to show how a jury instruction on circumstantial evidence would have changed the outcome of Petitioner's trial, or, as required, a likelihood that the outcome would have been different.  Therefore, the Second Department's determination that Petitioner was not denied the effective assistance of trial counsel, for failure to request a circumstantial evidence jury instruction, is not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, this claim fails.

## II.    **Unexhausted Claims**

Petitioner has four remaining claims: (1) a false evidence claim; (2) a Confrontation Clause claim; (3) an ineffective assistance of trial counsel claim based on several grounds; and (4) an actual innocence claim based on newly discovered evidence.  (Petition, Dkt. 1, at ECF 17.)  These

remaining claims, which Petitioner first raised in his Section 440 Motion, are unexhausted because

the state has not had a "full opportunity to resolve any constitutional issues," *i.e.*, via "one complete

round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838,

845 (1999); *see also Dollison v. Nassau County.*, No. 17-CV-2804 (JFB), 2019 WL 3531522, at

*7 n.8 (E.D.N.Y. Aug. 2, 2019) (noting that claims raised in a Section 440 motion "are not

exhausted unless petitioner seeks leave to appeal any denial of the motion") (citing *Pesina v.

Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).  It does not appear that Petitioner has exhausted these

claims, in part, because he has not yet successfully sought leave to appeal the denial of his Section

440 Motion.  (*See* Pet. Ex. 1, Dkt. 1-1, at ECF 26 (noting that Petitioner's appellate papers, seeking

leave to appeal his Section 440 Motion, were not accepted for filing by the Second Department

because they failed to include all necessary information).)[19]  Nonetheless, as described *supra*, the

Court may deny unexhausted federal *habeas* claims on the merits if they are meritless.  *See* 28

U.S.C. § 2254(b)(2); *Warren*, 2013 WL 1310465, at *11; *Ricks*, 2012 WL 162608, at *2.

Accordingly, the Court addresses each of Petitioner's remaining claims to determine if they are

meritless and may be dismissed.

---

[19] Respondent argues that the claims Petitioner brought in his Section 440 Motion are unexhausted because "he failed to seek leave to appeal from the dismissal of his § 440.10 motion." (Respondent's Memorandum of Law, Dkt. 9, ECF 380; *see also id.* at ECF 374, 383.)  That is incorrect.  Petitioner did seek leave, even if unsuccessfully.  (Pet. Ex. 1, Dkt. 1-1, at ECF 26.) Furthermore, it is not clear that Petitioner's Section 440 Motion was ever fully decided, orally or otherwise, by the trial court given that, at a hearing scheduled to hear testimony regarding Petitioner's newly discovered evidence claim, the trial court merely stated that "I am going to deny the 440 motion at this time but without prejudice.  If it comes to fruition that this woman [Joseph] decides to cooperate you can renew your motion." (R., Dkt. 9-5, at ECF 1478.)  Though a state court is not required to explain its decision in order for the decision to be entitled to AEDPA deference, *see, e.g.*, *Hawthorne v. Schneiderman*, 695 F.3d 192, 196 (2d Cir. 2012), the Court does not find that the state court's oral dismissal on the record is sufficient to conclude that it was actually addressing the entirety of Petitioner's Section 440 Motion.  In any event, though Respondent's argument as to why Petitioner's Section 440 claims are unexhausted is incorrect, the Court nonetheless concludes that Petitioner's claims are, in fact, unexhausted.

### A.    False Evidence Claim

Petitioner argues that his due process rights were violated because "[DNA expert] Lee's trial testimony was false."  (Reply, Dkt. 11, at 13.)  Given that this false evidence claim was first asserted in Petitioner's Section 440 Motion, the Court, for the reasons described *supra*, deems it unexhausted and will only deny it if it finds that the claim is meritless.  *See* 28 U.S.C. § 2254(b)(2); *Warren*, 2013 WL 1310465, at *11; *Ricks*, 2012 WL 162608, at *2.

"[I]n order to challenge a conviction based on the prosecution's use of false testimony, a habeas petitioner ha[s] to prove that: (1) false testimony was introduced; (2) the prosecutor knew or should have known that the testimony was false; (3) the false testimony went uncorrected; and (4) there was a reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Calderon v. Keane*, 115 F. App'x 455, 457 (2d Cir. 2004) (summary order) (citing *Shih Wei Su v. Filion,* 335 F.3d 119, 127 (2d Cir. 2003)).

Petitioner's argument fails at the first prong, as he has provided no evidence to support the assertion that Lee's testimony was false.  Petitioner argues that Lee's repeated use of the word "we" indicates that Lee "was not in fact the sole person who conducted the necessary analysis in which a conclusion was reached that there was a 'match' on a recovered handgun."  (Reply, Dkt. 11, at 13.)  However, Petitioner does not offer any specific evidence to support this allegation.  Furthermore, while Lee did refer to a "we" when testifying about the DNA analysis (*see, e.g.*, Tr., Dkt. 9-3, at 422:13, 422:25, 429:25), she also directly testified that "[f]or this particular case [she] analyzed all the data, [she] compiled all the data in a report."  (*Id.* at 421:23–24.)  Petitioner provides no evidence that this statement was false.  "[M]erely pointing out inconsistencies is insufficient to support an allegation of perjury."  *Brewer v. Cunningham*, No. 13-CV-2873 (NSR) (PED), 2018 WL 6705707, at *15 (S.D.N.Y. Feb. 8, 2018) (citing, *inter alia*, *United States v. Monteleone*, 257 F.3d 210 (2d Cir. 2001); *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir.

1995)), *report and recommendation adopted*, 2018 WL 6697991 (S.D.N.Y. Dec. 20, 2018); *see also Bester v. Conway*, 778 F. Supp. 2d 339, 346 (W.D.N.Y. 2011) ("A habeas petitioner's contention that a witness' testimony was unworthy of belief is not reviewable in habeas proceedings since credibility determinations are the province of the jury.") (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)); *Jackson v. Heath*, No. 10-CV-3449 (RJS) (AJP), 2010 WL 3075557, at *14 (S.D.N.Y. Aug. 6, 2010) ("The assessment of witness credibility lies solely within the province of the jury, and the jury is free to believe part and disbelieve part of any witness's testimony.") (quoting *United States v. Ware*, 577 F.3d 442, 447 (2d Cir. 2009)); *Anekwe v. Phillips*, No. 05-CV-2183 (ARR), 2007 WL 1592973, at *6 (E.D.N.Y. May 31, 2007) ("The petitioner has the burden of demonstrating, by a preponderance of evidence, that the witness committed perjury, and, in determining whether perjury occurred, a court must 'weigh all the evidence of perjury before it.") (quoting *Ortega v. Duncan,* 333 F.3d 102, 106–07 (2d Cir. 2003)).   Given that Petitioner has failed to show that any false testimony was introduced, he is also unable to show that prosecutor knew or should have known the evidence was false and then failed to correct it. *See Black v. Griffin*, No. 15-CV-8112 (ALC), 2019 WL 2551685, at *22 (S.D.N.Y. Jan. 14, 2019) ("In order to demonstrate that a prosecutor knowingly introduced false evidence, however, or failed to correct unsolicited evidence known to have been false, a petitioner would first have to demonstrate that the evidence in question was, in fact, *false.*"), *report and recommendation adopted*, 2019 WL 2548132 (S.D.N.Y. June 20, 2019).

Furthermore, even assuming that Petitioner could show that the evidence was false and that the prosecutor failed to correct it, his claim nonetheless fails because he is unable to show that "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Calderon*, 115 F. App'x at 457; *see also Shih Wei Su*, 335 F.3d at 126–27 ("Instead, even

when a prosecutor elicits testimony he or she knows or should know to be false, or allows such testimony to go uncorrected, a showing of prejudice is required."). Here, Petitioner's conviction was also supported by two eyewitness accounts, evidence which is completely unrelated to the DNA evidence. Accordingly, Petitioner is unable to show that there is a reasonable likelihood he would not have been convicted without the DNA evidence. *See Villafane v. Artus*, No. 09-CV-5545 (SJF), 2011 WL 6835029, at \*45 (E.D.N.Y. Nov. 17, 2011) ("[T]here is no reasonable likelihood that [a witness's] testimony affected the judgment of the trial jury since, *inter alia,* all of the elements of the crime for which petitioner was convicted were established through the testimony of other witnesses or by physical evidence linking petitioner to the crime.").

Accordingly, the Court finds that Petitioner's unexhausted false evidence claim is meritless and denies *habeas* relief on that claim.

### B.    Confrontation Clause Claim

Plaintiff also argues that DNA expert Lee's testimony implicates the Sixth Amendment's Confrontation Clause because her testimony implied that others were involved in the DNA analysis presented by Lee at trial, but Petitioner was unable to cross-examine these other DNA analysts. (*See* Reply, Dkt. 11, at 14.)  Given that this Confrontation Clause claim was only asserted in Petitioner's Section 440 Motion, the Court, for the reasons described *supra*, deems it unexhausted and will only deny it if it finds that the claim is meritless. *See* 28 U.S.C. § 2254(b)(2); *Warren*, 2013 WL 1310465, at \*11; *Ricks*, 2012 WL 162608, at \*2.

"The Sixth Amendment's Confrontation Clause provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." *Orlando v. Nassau Cty. Dist. Attorney's Office*, 915 F.3d 113, 121 (2d Cir. 2019) (internal quotation marks, alterations, and citation omitted).  "The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand

against the defendant and is available for cross examination." *United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009) (internal quotation marks and citation omitted). "To implicate the Confrontation Clause, the statement must be used to prove the truth of the matter asserted, and the statement must be 'testimonial.'" *Orlando*, 915 F.3d at 121 (quoting *Davis v. Washington*, 547 U.S. 813, 821–22 (2006)). Typically, evidence is testimonial if it constitutes "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (internal quotation marks, brackets, and citation omitted).

Petitioner's claim requires him to show that, in fact, there was testimonial hearsay admitted at his state trial. Petitioner does not do so. Instead, he argues that Lee's occasional use of the word "we" when testifying implies that there were others, whom Petitioner did not have the opportunity to cross-examine at trial, who participated in the process of analyzing Petitioner's DNA and comparing it to the DNA found on the murder weapon. (*See* Reply, Dkt. 11, at 13 (arguing that "Lee was not in fact the sole person who conducted the necessary analysis in which a conclusion was reached that there was a 'match' on a recovered handgun" because "[a]ll of Lee's answers to the trial prosecutor's questions about how she [LEE] came about performing the eventual conclusion of a 'match[]' [w]as qualified by the word 'we'") (emphasis omitted).) However, Petitioner does not provide any support for his argument, such as identifying a specific hearsay statement that was erroneously admitted into evidence or even identifying another DNA technician whose analysis was included in the documentary evidence that the prosecution introduced.

"Petitioner bears the burden of proving, by a preponderance of the evidence, that his federal constitutional rights were violated." *Lovacco v. Kelly*, No. 99-CV-3094 (GBD), 2005 WL 2482518, at *3 (S.D.N.Y. Oct. 7, 2005) (citing *Gaines v. Kelly*, 202 F.3d 598, 601 (2d Cir. 2000)). "A federal court may not grant habeas relief based upon unsubstantiated conclusions, opinions, or

speculation." *Morgan v. Lee*, No. 11-CV-390 (MAT), 2012 WL 5336167, at *8 (W.D.N.Y. Oct.
26, 2012) (internal quotation marks and citation omitted); *see also Wood v. Bartholomew*, 516 U.S.
1, 8 (1995) (noting that federal courts should not grant "habeas relief on the basis of little more
than speculation with slight support").   Without any specific evidence to support his claim, the
Court finds that Petitioner has not met his burden here.   Though, as previously discussed, Lee
occasionally used the word "we" when describing the work she did (*see, e.g.*, Tr., Dkt. 9-3 at
421:11 ("We test 16 different locations."), *id.* at 428:19–20 ("From the data generated, we were
able to determine that there was a mixture [of DNA] present.")), she also specifically testified that
"[f]or this particular case, I analyzed all the data, I compiled all the data in a report" (*id.* at 421:23–
24), and that the conclusions she reached regarding the comparison of Petitioner's DNA and the
DNA found on the murder weapon were her own (*see id.* at 430:19–20 ("So *my conclusion* was
that [Petitioner] could be the source of this DNA.") (emphasis added); *id.* at 433:3–4 ("So based
on that comparison, *I determined* that [Petitioner] could be the source of that DNA.") (emphasis
added)).[20]   Without more, Petitioner's speculation about Lee's use of the word "we" is insufficient
to state a Confrontation Clause claim given Lee's testimony.   *See Pruitt v. Kirkpatrick*, No. 16-
CV-2703 (JMF), 2017 WL 4712225, at *3 (S.D.N.Y. Oct. 18, 2017) ("[The petitioner] fails to
specify the alleged hearsay statements in his [p]etition—which is reason enough to reject that
portion of the claim."); *Algarin v. Breslin*, No. 06-CV-3175 (SLT), 2010 WL 395956, at *6
(E.D.N.Y. Feb. 4, 2010) (noting that "the protections of the Confrontation Clause only extend to

---

[20] In reviewing Lee's testimony, the Court found only one instance where her testimony
implied another person was involved in the specific analysis and conclusions she was testifying
to.  (*See id.* at 434:22–24 ("And in this particular case, there was not enough information for us to
determine a single source contributor.").)  However, in looking at Lee's testimony as a whole, the
Court does not find that this singular statement suggests that others contributed to the analysis or
conclusions that Lee testified to, but rather was indicative of Lee's tendency to refer to her own
work as work of the lab that employed her by referring to herself in the plural "we" or "us."

statements *admitted* into evidence for the truth of the matter asserted"); *Grant v. Graham*, No. 08-CV-10453 (LBS), 2009 WL 3401181, at *6 (S.D.N.Y. Oct. 19, 2009) ("A challenge under the Confrontation Clause is entirely frivolous where the case relied entirely on first-hand testimony.") (internal quotation marks and citation omitted); *Thompson v. Burge*, No. 05-CV-2914 (JFB), 2007 WL 2020185, at *10 n.6 (E.D.N.Y. July 6, 2007) (finding no implication of petitioner's confrontation clause rights where "[p]etitioner's counsel was fully able to confront and cross-examine the two victims who testified at trial[,] . . . [and] [p]etitioner has pointed to no statements of the unavailable third victim . . . that were erroneously admitted"); *see also Contreras v. Artus*, No. 09-CV-7940 (JSR) (FM), 2012 WL 4044872, at *9 (S.D.N.Y. Sept. 11, 2012) ("A habeas petitioner obviously is not entitled to have his conviction set aside merely because his counsel speculates that some constitutional violation might have occurred."), *report and recommendation adopted*, 2013 WL 829170 (S.D.N.Y. Mar. 4, 2013), *aff'd*, 778  F.3d 97 (2d Cir. 2015).

Accordingly, the Court finds that Petitioner's Confrontation Clause claim is meritless and denies relief on this basis.

### C.   Ineffective Assistance of Counsel Claims

In addition to the exhausted ground for an ineffective assistance claim discussed *supra*, Petitioner also raises several additional unexhausted grounds for an ineffective assistance of trial counsel claim.  (Petition, Dkt. 1, at ECF 17.)  Given that these ineffective assistance claims were only asserted in Petitioner's Section 440 Motion, the Court, for the reasons described *supra*, deems them unexhausted and will only deny them if it finds that they are meritless.  *See* 28 U.S.C. § 2254(b)(2); *Warren*, 2013 WL 1310465, at *11; *Ricks*, 2012 WL 162608, at *2.

As discussed in more detail *supra*, "[t]o prevail [on an ineffective assistance claim], a defendant must establish both of *Strickland*'s prongs because, otherwise, 'it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the

result of the process unreliable, and the sentence or conviction should stand.'" *Eze*, 321 F.3d at 123 (quoting *Bell*, 535 U.S. at 695).  Furthermore, "[o]ur scrutiny of counsel's performance must be 'highly deferential' because we must apply 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Rivas*, 780 F.3d at 547 (quoting *Strickland*, 466 U.S. at 689).  Finally, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018) (quoting *Strickland*, 466 U.S. at 697); *see also id.* ("As the Supreme Court admonished, '[t]he object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") (quoting *Strickland*, 466 U.S. at 697).

Petitioner argues that his trial counsel was ineffective because he (1) did not object to DNA expert Lee's testimony; (2) did not request independent testing of the DNA on the murder weapon or call his own DNA expert; (3) did not object to empaneling certain jurors during jury selection; (4) did not object to improper remarks made by the prosecutor during summations; (5) did not object to the court's response to notes from the jury during its deliberation; (6) admitted that Petitioner's DNA was on parts of the murder weapon; (7) agreed to a stipulation regarding the source of buccal swabs that were subsequently used in Lee's DNA analysis; and (8) did not request a missing witness charge for Shields and Guerrero.  (*See* Pet. Ex. 1, Dkt. 1-1, at ECF 190–226; *see also* R., Dkt. 9-5, at ECF 1436–37.)  Even assuming *arguendo* that these claims satisfy *Strickland*'s deficiency prong, it is clear that these claims nonetheless fail to satisfy *Strickland*'s prejudice prong and therefore do not support Petitioner's argument that he received ineffective assistance of counsel.

"The prejudice inquiry is . . . ineluctably tied to the strength of the prosecution's evidence." *Garner*, 908 F.3d at 862; *see also Waiters*, 857 F.3d at 480 ("[A] verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'") (quoting *Strickland*, 466 U.S. at 696). Here, none of Petitioner's claims addresses the eyewitness testimony of Murray and Paige, which formed the core of the prosecution's case. Four of Petitioner's grounds focus on errors relating to the introduction of DNA evidence against Petitioner.[21] However, as discussed *supra*, Petitioner has not demonstrated that without the DNA evidence, he would not have been convicted, given the eyewitness testimony against him. Petitioner also does not show how any potential deficiencies in the jury selection process, the prosecutor's statements during summations, or the trial court's handling of the jury notes directly undermined the eyewitness testimony against him.[22] Finally, given that Guerrero and Shields also affirmatively identified Petitioner as the shooter, it is unclear

---

[21] Petitioner also argues that his trial counsel was ineffective for conceding, during summation, that Petitioner's DNA was on the handgun. (Pet. Ex. 1, Dkt. 101, at ECF 218–19.) The Court notes that trial counsel's statements were made in the context of explaining why the presence of that DNA did not mean that Petitioner necessarily ever touched the murder weapon. (*See, e.g.*, Tr., Dkt. 9-3, at 535:9–10 (stating that "[j]ust because there's DNA on the slide and the safety does not equal possession").) Moreover, Petitioner does not show how but for trial counsel's statements, he would not have been convicted, given the eyewitness testimony against him.

[22] Specifically, Petitioner argues that his trial counsel was ineffective because he failed to question all of the jurors as to whether they would "hold it against [Petitioner] if he were not to testify at the trial [o]n his own behalf," and failed to seek to remove a juror whose "comments reflect[ed] [an] inability to be fair and impartial if [Petitioner] were not to testify at the trial." (Pet. Ex. 1, Dkt. 1-1, at ECF 212–13.) Petitioner also argues that his trial counsel was ineffective for failing to object to improper statements made by the prosecution during summation that vouched for the witnesses' credibility, offered the prosecutor's own opinion about the evidence, and appealed to the jury's sympathy by stating that one of the witnesses, Paige, had nightmares about the murder. (*Id.* at ECF 214–17.) Finally, Petitioner also argues that his trial counsel was ineffective for failing to object when the trial court failed to enter the jury notes into the record as court exhibits, as well as when the trial court waited one day to respond to a jury note. (*Id.* at ECF 217.)

how their testimony would have harmed (as opposed to strengthened) the prosecution's case against him.  In sum, because Petitioner's ineffective assistance claims, in no way, undermine the strength of the prosecution's case against him, he has failed to meet the "heavy burden" he faces in demonstrating prejudice required under *Strickland*.  *See Garner*, 908 F.3d at 865 (finding that where prosecution's case was strong, petitioner "[bore] a heavy burden, to say the least, in demonstrating that his attorney's allegedly serious errors at trial merit[ed] the grant of habeas relief") (internal quotation marks and citation omitted).

Accordingly, the Court finds all of Petitioner's unexhausted ineffective assistance of trial counsel claims to be meritless and denies *habeas* relief on these grounds.

### D.    Actual Innocence Claim

Petitioner states that "[n]ew [e]vidence has been discovered since the entry of judgment" (Petition, Dkt. 1, at ECF 17) and asks that "the Court [] equitably proceed with the actual innocence claim" even though Petitioner's new witness, Damali Joseph, "is reluctant to appear due to mental, emotional and employment issues" (Petitioner Letter, Dkt. 12, at ECF 1540).  Given that this actual innocence claim was only asserted in Petitioner's Section 440 Motion, the Court, for the reasons described *supra*, deems it unexhausted and will only deny the claim if it finds that it is meritless. *See* 28 U.S.C. § 2254(b)(2); *Warren*, 2013 WL 1310465, at *11; *Ricks*, 2012 WL 162608, at *2.

"A credible actual innocence claim 'may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief.'"  *Washington v. Artus*, No. 07-CV-7769 (DAB), 2014 WL 774970, at *4 (S.D.N.Y. Feb. 25, 2014) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)) (internal ellipsis omitted).  Therefore, an "actual innocence claim plays a 'procedural, not substantive' role in [a *habeas*] case."  *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *Rivas*, 687 F.3d at 541).  A claim of actual innocence "must be both 'credible' and 'compelling.'"  *Rivas*, 687 F.3d at 541 (quoting *House v. Bell*, 547

45

U.S. 518, 521, 538 (2006)); *Amin v. Hulihan*, No. 10-CV-2293 (PKC), 2016 WL 6068128, at *5 n.6 (E.D.N.Y. Oct. 13, 2016) ("A claim of actual innocence must be supported by 'new reliable evidence' and is therefore 'rarely successful.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  "For the claim to be 'credible,' it must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'"  *Rivas*, 687 F.3d at 541 (quoting *Schlup*, 513 U.S. at 324).  "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'"  *Id.* (quoting *House*, 547 U.S. at 538); *see also McQuiggin*, 569 U.S. at 385, 395, 399.

In support of his actual innocence claim, Petitioner provides an affidavit from Joseph, who states that she "personally observed an individual nicknamed "Folk" [*i.e.*, the victim, Philip] get shot multiple times inside the location."  (Joseph Affidavit ("Joseph Aff."), Dkt. 12-1, at 1.)  She also states that "[t]he person that had did the shooting [sic] was approximately 5'8" to 9 inches in height, brown-skinned in complexion, and weighed about 165 to 175 lbs., and was wearing dark colored clothing except for his sneakers being white-colored."  (*Id.*; *see also id.* at 2 (stating that she only observed "one individual doing the shooting").)  Finally, Joseph also states that, while Joseph was at the precinct, Detective Kalisky insisted that a "very tall and dark-skinned black person" was the shooter, which Joseph consistently denied.  (*Id.* at 2; *see also id.* (noting that Joseph now knows the tall male to be Petitioner).)

Plaintiff's claim fails on two counts.  First, the evidence provided by Petitioner in support of his claim is neither credible nor compelling.  Though Joseph's affidavit is an additional

eyewitness account of the events surrounding Philip's murder, it is not sufficiently trustworthy to be considered credible. For example, though Joseph states that she "personally observed an individual nicknamed 'Folk' get shot multiple times" (Joseph Aff., Dkt. 12-1, at 1) and provides a description of the shooter (*id.*), she does not provide any details of the actual event, such as whether there was a fight between Petitioner and Philip just before the shooting, as both Murray and Paige testified, or Pressley's role in the shooting, as also testified to by Murray and Paige. *See Lanier v. Lee*, No. 17-CV-89 (LEK), 2017 WL 4838781, at *5 (N.D.N.Y. Oct. 24, 2017) (finding witness affidavit not trustworthy when "[t]he affidavit does not identify another culprit and provides virtually no detail about the incident or [the witness's] perception of it; rather, it merely contradicts, without elaboration, eyewitness evidence at trial that [the p]etitioner was the shooter"). Joseph provides more details about what occurred in the aftermath of the shooting, such as the events at the precinct, but her account contradicts the testimony provided by Murray, Paige, and Kalisky in key respects. For example, Joseph states that Murray and Paige, as well as three other males, all waited in a room together at the precinct before they participated in the lineups, which contradicts Kalisky's testimony that the witnesses were kept in separate rooms. (*Compare* Joseph Aff., Dkt. 12-1, at 2 ("Also present in the room [at the precinct] with the two females (one [of] whom was the strip dancer at the Montauk residence), were one other female, and three other males"), *with* Hr., Dkt. 9-1, at ECF 403:6 (noting that Shields, Guerrero, Murray, and Paige "were all separated in different rooms" at the precinct before the line-ups).) Petitioner provides no corroboration to support Joseph's conflicting account of these events. *See Lopez v. Miller*, 915 F. Supp. 2d 373, 401 (E.D.N.Y. 2013) ("As to new witness testimony in particular, the court considers the potential motives to be untruthful that the witness may possess, *corroboration or the lack thereof*, internal inconsistency, and the inferences or presumption that crediting particular testimony would

47

require.") (internal quotation marks, alteration, and citation omitted) (emphasis added).  The reliability of Joseph's affidavit is further undermined by the fact that it was provided more than six years after the events in question.  *See Rosario v. Ercole*, 582 F. Supp. 2d 541, 601 (S.D.N.Y. 2008) ("In addition, while the prosecution's witnesses testified to events that occurred over two years prior, petitioner's post-conviction hearing witnesses testified to events that occurred about six years prior.  Even where petitioner's witnesses may have absolutely no intention of misleading the court, six-year old memories are inherently not as reliable as two and a half-year old ones."), *aff'd*, 601 F.3d 118 (2d Cir. 2010).  In sum, the Court finds that Joseph's affidavit is not sufficiently credible to support Petitioner's actual innocence claim.  *Amin*, 2016 WL 6068128, at *5 n.6 ("A claim of actual innocence must be supported by 'new reliable evidence' and is therefore 'rarely successful.'") (quoting *Schlup*, 513 U.S. at 324).

Petitioner's actual innocence claim also fails because the affidavit is not sufficiently compelling.  *See Rivas*, 687 F.3d at 541 (a claim of actual innocence "must be both 'credible' and 'compelling'") (quoting *House*, 547 U.S. at 521, 538).  New evidence that merely conflicts with the evidence presented at trial is insufficient to demonstrate that "no reasonable juror," presented with this new evidence "would find [the petitioner] guilty beyond a reasonable doubt." *Rivas*, 687 F.3d at 541 (internal quotation marks and citation omitted); *see DiMattina v. United States*, 949 F. Supp. 2d 387, 421 (E.D.N.Y. 2013) ("'Newly discovered' affidavits and phone records offering what is claimed to be a conflicting narrative to the one presented by [the victim] at trial do not sufficiently support a finding that the consistent testimony of [the victim and other corroborating witnesses] should be disregarded and that [the petitioner] is actually innocent."); *Rosario*, 582 F. Supp. 2d at 559–60 (finding newly-discovered alibi testimony was not credible because, *inter alia*, the new evidence just created "a credibility contest" between the prosecution's case at trial and the

newly-discovered evidence).  Accordingly, given that Petitioner has not shown that his newly discovered evidence, *i.e.*, Joseph's belatedly produced eyewitness statement, is sufficiently credible and compelling, his actual innocence claim fails.

Second, even if Petitioner's evidence was sufficient to state an actual innocence claim, his claim would nonetheless fail because such a claim is only designed to allow for a merits-evaluation of a *habeas* claim that would otherwise be procedurally barred.  *See Hyman*, 927 F.3d at 655 (noting that even if Petitioner successfully brings an actual innocence claim, "the claim cannot itself afford [the petitioner] habeas relief from his state conviction.  It can only open a gateway to federal review of an otherwise procedurally barred [*habeas*] claim that, if itself successful, could afford him relief.") (citing *Schlup*, 513 U.S. at 314).  Here, regardless of whether Petitioner has a successful actual innocence claim, the Court has already considered all of Petitioner's *habeas* claims and has found them deficient, for the reasons discussed *supra*.  Therefore, even if Plaintiff had met the standard for actual innocence, he is still not entitled to federal *habeas* relief.

Finally, to the extent that Petitioner seeks to bring a freestanding innocence claim, the Court first notes that the United States Supreme Court has yet to hold that there is a freestanding federal constitutional claim of actual innocence.  *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether [a federal right to be released upon proof of actual innocence] exists is an open question.  We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."); *House,* 547 U.S. at 554–55 (declining to decide whether a freestanding actual innocence claim exists); *Herrera v. Collins*, 506 U.S. 390, 404 (1993) (finding that habeas petitioner who was not seeking to excuse procedural default was not entitled to relief based on actual innocence claim); *cf. McQuiggin*, 569 U.S. at 386

49

("We hold that actual innocence, if proved, serves as a gateway through which a [habeas] petitioner may pass whether the impediment is a procedural bar . . . [or] expiration of the statute of limitations.").

Moreover, "[e]ven assuming *arguendo* the existence of a freestanding federal claim of actual innocence, the Supreme Court has suggested that the threshold showing for such a claim would be 'extraordinarily high.'" *Castellanos v. Kirkpatrick*, No. 10-CV-5075 (MKB), 2015 WL 7312908, at *8 (E.D.N.Y. Nov. 18, 2015) (quoting *Herrera*, 506 U.S. at 417). "This burden would require more than satisfying '*Schlup*'s gateway standard for obtaining federal review despite a state procedural default.'" *Clark v. Capra*, No. 14-CV-2507 (VB) (LMS), 2017 WL 4685298, at *9 (S.D.N.Y. June 22, 2017) (quoting *House*, 547 U.S. at 555 and referencing *Schlup*, 513 U.S. 298), *report and recommendation adopted*, 2017 WL 4685104 (S.D.N.Y. Oct. 17, 2017). Since Plaintiff's evidence does not satisfy this lower standard, it necessarily does not satisfy whatever this higher standard might be. *See id.* at *9 ("[P]etitioner would have to show more than that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.' Here, Petitioner cannot satisfy the *Schlup* burden [to excuse a procedural default] and, therefore, necessarily fails to satisfy the higher burden contemplated by *House.*") (quoting *McQuiggin*, 569 U.S. at 386); *DiMattina*, 949 F. Supp. 2d at 415–16 ("Despite its reluctance to recognize innocence as a ground for habeas relief, the Court nonetheless hinted that a successful innocence claim would, 'at the least . . . require[ ] more convincing proof of innocence than' what is required on a gateway claim.") (quoting *House*, 547 U.S. at 555).

Accordingly, the Court finds Petitioner's actual innocence claim—whether considered as a procedural vehicle or a freestanding substantive claim—meritless, and his request for *habeas* relief based on this claim is denied.

**CONCLUSION**

For the reasons set forth above, the petition for a writ of *habeas corpu*s pursuant to 28 U.S.C. § 2254 is denied.  Petitioner is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Middleton v. Att'ys Gen.*, 396 F.3d 207, 209 (2d Cir. 2005) (denying certificate of appealability where petitioner has not shown that "reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks, ellipsis, and citation omitted). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

<div style="margin-left:40%">

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

</div>

Dated: April 15, 2020
     Brooklyn, New York